

Eric J. Wallach (ewallach@kasowitz.com)
Blythe E. Lovinger (blovinger@kasowitz.com)
Joseph A. Piesco, Jr. (jpiesco@kasowitz.com)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

Attorneys for Plaintiff
Elliott Management Corporation

08 CV 01872

RECEIVED
FEB 2 6 2008
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

ELLIOTT MANAGEMENT CORPORATION,      :      Civil Action No.

                        Plaintiff,      :

                vs.      :      **VERIFIED COMPLAINT**
                                        **FOR INJUNCTIVE RELIEF**
                                        **& DAMAGES**

CEDAR HILL CAPITAL PARTNERS, LLC,      :
CEDAR HILL CAPITAL PARTNERS ONSHORE,      :
LP, CEDAR HILL CAPITAL PARTNERS      :
OFFSHORE, LTD, CEDAR HILL FUND      :
MANAGEMENT, LLC and all subsidiaries, divisions and      :
affiliates of CEDAR HILL CAPITAL PARTNERS,      :
LLC,      :
                                        :
                        Defendants.      :

-------------------------------------------------------------------x

        Plaintiff, Elliott Management Corporation ("Elliott" or "Plaintiff"), by and

through its attorneys, Kasowitz, Benson, Torres & Friedman LLP, as and for its Verified

Complaint (the "Verified Complaint") against Defendants Cedar Hill Capital Partners, LLC,

Cedar Hill Capital Partners Onshore, LP, Cedar Hill Capital Partners Offshore, Ltd., Cedar Hill

Fund Management, LLC and all subsidiaries, divisions and affiliates of Cedar Hill Capital

Partners, LLC (collectively, "Defendants" or "Cedar Hill"), alleges as follows:

## NATURE OF ACTION

This action concerns a recently unearthed secret conspiracy led by Cedar Hill against Elliott, a well-known and successful investment management company that competes with Cedar Hill, to misappropriate and use for unlawful competitive purposes Elliott's highly confidential and proprietary analytical software, including the computer applications, source code, executable code, structures, processes and other components underlying Elliott's sophisticated computer application (hereinafter, the "Software") that took Elliott years to develop and has cost millions of dollars to create, enhance and maintain. Specifically, as set forth in detail below, Cedar Hill unlawfully schemed with an employee and a consultant of Elliott, both of whom Cedar Hill knew worked in Elliott's Applications Development Department (and both of whom have since been terminated), to literally steal the Software in order to use it for its own trading activities. Cedar Hill's illicit conduct is nothing short of an overt act of corporate espionage. Now that Cedar Hill's conspiracy has been disclosed (although the full extent of it has yet to be discovered), Elliott is seeking to prevent Cedar Hill and its cohorts from further wrongfully exploiting its confidential and proprietary information, including the Software, and to put an immediate halt to the substantial irreparable harm Cedar Hill has caused, and continues to cause, Elliott to suffer as a result of its unlawful activities.

As early as October 2007, Cedar Hill, a relatively new hedge fund, set in motion a scheme to misappropriate Elliott's Software. In pursuit of its illicit goals, Cedar Hill enlisted a group of "consultants," which included one of Elliott's key computer development employees, Ragumarn Srinivasan ("Srinivasan"), and a key computer programming consultant, Alomgir Miah ("Miah"), both of whom Cedar Hill knew had unfettered access to Elliott's Software and its underlying source code and executable code, and directed them to develop within a very short

period of time (less than three months) a computer application that would perform the same analytical functions as Elliott's Software.

In January 2008, Elliott discovered that Srinivasan and Miah were working for Cedar Hill. Through Elliott's investigation, it learned and came to believe that Cedar Hill, using Srinivasan and Miah as "double agents," (a) had misappropriated substantial amounts of the confidential and proprietary computer source code, executable code, software applications, computer structures, processes and other components of the Software; (b) knew, understood and/or directed Srinivasan and Miah to remove from the computer source code underlying the Software the electronic tag that expressly identifies it as the property of Elliott, thereby further impairing the integrity of the Software; (c) wrongfully interfered with Elliott's contractual agreements with Srinivasan and Miah; and (d) unlawfully used Elliott's Software for purposes of developing its competing computer application. Based on Elliott's investigation thus far, Elliott has reason to believe that Cedar Hill knew, understood and/or directed Srinivasan and Miah to remove, copy and/or transfer Elliott's Software during Elliott's business hours and using Elliott's computer resources.

Miah, one of Cedar Hill's co-conspirators, recently admitted to their scheme. Critically, Miah has provided *a sworn Affidavit admitting to the aforementioned wrongful conduct*. Among other things, Miah's Affidavit includes a stark admission that he and Srinivasan deliberately stole *more than 50% of the source code* underlying Elliott's Software and that same was used to create the computer application which they "developed" at the direction of Cedar Hill.

Miah's Affidavit was provided to Elliott following the filing of an action by Elliott in the Supreme Court of the State of New York, New York County captioned <u>Elliott Management</u>

Corporation v. Hirst, et al., Index No. 600239/08 (the "State Action") on January 25, 2008 against Miah, Srinivasan and other co-conspirators known at the time.[1] The Court in the State Action immediately granted Elliott a temporary restraining order (the "TRO"), which as of the filing of this action remains in effect, prohibiting defendants and anyone acting in concert with them from using, disclosing or destroying the Software and any other Elliott confidential information and trade secrets, and requiring the return of all such material. Since the commencement of the State Action, Elliott has learned additional facts implicating Cedar Hill in the conspiracy to steal Elliott's Software, requiring that Elliott seek emergent relief from this Court.

As set forth below, by its conduct Cedar Hill has unlawfully misappropriated Elliott's trade secrets and confidential and proprietary information, including the Software, for its own competitive use and, in so doing, has violated various common law legal obligations it owes to Elliott. Equally critical, by gaining unauthorized access to Elliott's protected computers and stealing Elliott's Software, Cedar Hill has directly violated the federal Computer Fraud and Abuse Act ("CFAA"). Cedar Hill's improper and unlawful actions have caused, and will continue to cause into the future, Elliott to suffer incalculable losses and damages to its business and to the integrity of the Software, as well as injury to its business reputation. Accordingly, Elliott seeks, *inter alia*:

> (i)    an injunction temporarily, preliminarily and permanently enjoining Cedar Hill, its agents, employees and representatives, and all persons or entities working in concert with any of them, from using in any way, directly or indirectly, or disclosing to any person or entity, Elliott's confidential, proprietary and trade secret information including, but not limited to, any computer source code, executable code, software applications, computer

---

[1] The other defendants included Alan Hirst ("Hirst"), a long-time friend and believed business partner of Srinivasan, and S Tech Corporation ("S Tech"), a company that provides information technology services to investment managers. Hirst and Srinivasan are both believed to be principals of S Tech.

structures, processes and other components of the Software, as well as any computer applications developed by or for Cedar Hill that contain any of Elliott's confidential, proprietary and trade secret information;

(ii)    an order requiring Cedar Hill to immediately return any and all of Elliott's confidential, proprietary and trade secret information, including without limitation, the Software, and directing that Cedar Hill is not to retain any documents, electronic or otherwise, concerning same;

(iii)    an injunction temporarily, preliminarily and permanently enjoining Cedar Hill, its agents, employees and representatives, and all persons or entities working in concert with any of them, directly or indirectly, from interfering with the contractual relationships between Elliott and its agents, employees and representatives;

(iv)    an order mandating that Cedar Hill, its agents, employees and representatives, and all persons or entities working in concert with any of them, preserve and not delete, erase, allow to spoliate, destroy, discard, obscure or otherwise dispose of any documents, electronic or otherwise, that in any way concern Elliott's confidential, proprietary and trade secret information;

(v)    an order granting Elliott leave to immediately commence discovery, including depositions, in aid of preliminary injunction proceedings before the Court;

(vi)    an award of damages to Elliott, in an amount to be determined;

(vii)    an award of punitive damages;

(viii)    an award of attorneys' fees and costs;

(ix)    an accounting of all monies, profits and benefits received by Cedar Hill relating in any way to Elliott's confidential and proprietary information including, but not limited to, the Software; and

(x)    such other and further relief as the Court may deem appropriate.

## THE PARTIES

1.    Plaintiff Elliott Management Corporation is a corporation organized under the laws of the state of Delaware. Elliott's principal place of business is located at 712 Fifth Avenue, New York, New York 10019.

2.      Upon information and belief, Defendant Cedar Hill Capital Partners, LLC is a limited liability company organized under the laws of the state of Delaware, with its principal place of business located at 445 Park Avenue, 5th Floor, New York, New York 10022. Upon information and belief, Cedar Hill Capital Partners, LLC is the investment manager of Cedar Hill Capital Partners Onshore, LP and Cedar Hill Capital Partners Offshore, Ltd.

3.      Upon information and belief, Defendant Cedar Hill Capital Partners Onshore, LP, is a limited partnership organized under the laws of the state of Delaware, with its principal place of business located at 445 Park Avenue, 5th Floor, New York, New York 10022.

4.      Upon information and belief, Defendant Cedar Hill Capital Partners Offshore, Ltd. is a corporate entity organized under the laws of the Cayman Islands, with its principal business address being P.O. Box 896 GT, Harbour Centre, 2nd Floor, George Town, Grand Cayman, Cayman Islands, B.W.I.  Upon information and belief, Cedar Hill Capital Partners Offshore, Ltd. regularly operates and conducts business through Cedar Hill Capital Partners, LLC's offices in New York.

5.      Upon information and belief, Defendant Cedar Hill Fund Management, LLC is a limited liability company organized under the laws of the state of Delaware, with its principal office located at 445 Park Avenue, 5th Floor, New York, New York 10022.  Upon information and belief, Cedar Hill Fund Management, LLC is the general partner of Cedar Hill Capital Partners Onshore, LP.

## JURISDICTION & VENUE

6.      This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. § 1331 insofar as Plaintiff alleges claims under the CFAA, 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(4) and 1030(a)(5).

7.    This Court possesses supplemental jurisdiction over Elliott's causes of action arising under New York State statutory and common law pursuant to 28 U.S.C. § 1367(a).

8.    Venue is properly placed in the Southern District of New York pursuant to 28 U.S.C. § 1391(a) because Plaintiff and Defendants reside and/or regularly conduct business in the Southern District of New York and a substantial portion of the events underlying this action took place within the Southern District of New York.

## FACTUAL ALLEGATIONS

### I.    Elliott's Proprietary Analytical Software

9.    Elliott is an investment fund manager that, together with its affiliates and related entities and funds, manages over $10 billion in investments.  In connection with its investment management business, Elliott uses a variety of highly sophisticated, proprietary computer applications, which applications have been (and continue to be) developed in-house by teams of specialized software developers and computer programmers.  These computer applications, including the Software, were developed over several years, and at considerable expense to Elliott.

10.    One of Elliott's primary investment business activities involves the management of investment funds in the area of structured finance.  Particularly, Elliott's Structured Credit/CDO Group is heavily engaged in the sophisticated area of trading in Collateralized Debt Obligations ("CDO"), which essentially involves the trading of loans, bonds and asset-backed securities, typically securitized by loan instruments, such as residential and commercial mortgages.

11.    In order to facilitate its ability to analyze loans, bonds and related instruments for purposes of trading in these securities, Elliott developed the Software.  The

Software was designed at the request, and under the direction, of Charles Schorin ("Schorin"), a portfolio manager with primary responsibility for asset and mortgage backed securities at Elliott.

12.    The Software is a proprietary suite of software tools owned by Elliott that is uniquely designed to enable Elliott to manage portfolios consisting of thousands of loans and bonds, as well as credit derivatives referencing bonds and pools of mortgages and other loans that typically comprise mortgage-backed securities and CDOs. The Software enables Elliott's Structured Credit/CDO Group to organize and analyze on a granular level the incredibly vast amount of data relating to the thousands of underlying loans primarily purchased from commercial databases, to perform scenario analyses for these loans and project their performances in varied market conditions in order to make educated trading decisions, and to display and manage the results of the analyses along with other relevant information to inform Elliott's trading decisions with respect to the loans and related instruments.

13.    Elliott has been extremely successful in the CDO market, and its development and use of the Software has contributed to this success. In fact, unlike computer applications developed by its competitors, the computer source code, executable code and software applications underlying Elliott's Software were developed in a manner that enables Elliott to analyze CDOs, and their underlying loans, on a much more granular level. This gives Elliott a strong competitive edge in the marketplace, including its ability to outperform (in terms of rates of return) competitors.

14.    Elliott has spent (and continues to spend) a vast amount of time, resources and money to develop, enhance and maintain the Software -- it took the work of its computer development team over two years to develop the Software, at a cost of millions of dollars. Elliott employees and computer consultants hired by Elliott developed and designed in-house the entire

Software for Elliott, including: (i) the overall architecture, design and implementation of the Software; (ii) the high-level processes, configurations, sophisticated algorithms and database interface mechanisms that provide the environment for the Software; (iii) the mechanism to package the data and interface with the commercial analytical engine to accept and analyze the data and output the results in a form that can be used by other parts of the Software; (iv) the ability to run the Software in a multi-threaded environment, greatly enhancing performance and hence the ability to run alternative scenarios and to utilize the results in a timely manner; (v) the architecture, design and coding of the Software that made it grid computing enabled; and (vi) the database storage mechanism for managing the scenarios, assumptions and conditions which are inputs to the analytical process.

15.     In or around May 2006, Elliott hired Srinivasan as a full-time employee in its Applications Development Department to work on a full-time basis, along with others, to implement developments to the Software, maintain it and assist in its operation.

16.     In or around March 2007, Elliott engaged Miah as a full-time consultant in its Applications Development Department to help develop and enhance the Software.

17.     Although the Software was created by Elliott approximately nine months before Srinivasan was hired as an employee and approximately 18 months before Miah was engaged as a consultant, Srinivasan and Miah each played a crucial role in the continued development and enhancement of the Software. As such, Srinivasan and Miah had intimate knowledge of Elliott's confidential and proprietary computer source code, executable code, structure, process and other components of the Software that had been developed by Elliott. In fact, Srinivasan and Miah met and/or corresponded with Schorin and other members of the

Structured Credit/CDO Group on a daily basis to discuss improvements and modifications to the Software.

18.    Elliott is the sole owner of the Software, including without limitation the confidential and proprietary computer source code, executable code, software applications, computer structures, processes and other components of the Software, none of which is in the public domain.

## II.    The Confidential and Proprietary Nature of the Software

19.    Elliott has taken, and continues to take, reasonable protective measures necessary to maintain the confidentiality of the Software, including, among other things, (i) "tagging" the computer source code underlying the Software in order to identify it as the exclusive property of Elliott; (ii) requiring all employees and consultants to sign confidentiality agreements; (iii) prohibiting its employees from engaging in outside business activities that would conflict with their obligations to Elliott or result in the disclosure of its confidential and proprietary business information and trade secrets; and (iv) limiting access to the Software only to those employees and consultants who have a specific and legitimate business need for such access.

### A.    The Information Protection Agreement

20.    Elliott requires all employees and consultants to execute and comply with the terms and conditions set forth in Elliott's Information Protection Agreement (the "IP Agreement").  True and correct copies of the IP Agreements executed by Srinivasan and Miah are attached hereto as Exhibit A.

21.    Pursuant to the IP Agreement, employees and consultants expressly acknowledge that during the course of their employment or consultancy with Elliott they will

"develop and/or utilize information that is considered to be proprietary and/or confidential" to

Elliott. The IP Agreement refers to such confidential and/or proprietary information as

"Protected Information."

22.    The IP Agreement defines Protected Information to include:

> information relating to any investment position, contract, asset, liability or
> obligation (whether held "long" or "short") ("Position"), and any analysis
> and/or strategy relating to any such Position; . . . information that is
> designated, expressly or by implication, by any of the Companies as
> confidential or proprietary information; and . . . any other information of a
> type customarily considered confidential or proprietary by persons
> engaged in portfolio management and/or trading activities.

23.    In signing the IP Agreement, Elliott's employees and consultants expressly

acknowledge that ownership of Protected Information rests solely with Elliott and cannot be used

for anyone else's benefit. Specifically, the IP Agreement provides, in pertinent part, as follows:

> Protected Information (whether made available to the Employee or
> developed by the Employee while employed by [Elliott]) is the property of
> the Companies. Employee agrees that Protected Information shall be kept
> confidential by the Employee, *and shall not be, directly or indirectly,*
> *copied, utilized or exploited by him or communicated to any third person*
> (except as required in connection with his performance of services for or
> on behalf of [Elliott], or except as otherwise required by law). (emphasis
> added)

24.    Moreover, the IP Agreement requires that, upon termination of employment

employment or consultancy (or "on demand"), an employee or consultant must return any and all

Protected Information to Elliott. Specifically, the IP Agreement provides, in pertinent part, as

follows:

> On demand made at any time by Elliott, Employee shall return to Elliott
> any and all copies (whether physical or electronic) of documents including
> any Protected Information.

> Immediately upon the termination of my employment with the Company
> [Elliott], I am required to return all Company-owned property, including,
> but not limited to, confidential or proprietary business information of the
> Company, computer files, diskettes, documents (electronic or otherwise),

- 11 -

computer databases, manuals, computer equipment, computer software, files, money, securities, keys, credit cards, handbooks, financial and other reports, notes and all other information or property obtained or used by me in the course of my employment.

**B.    Elliott's Outside Business Activities Policy**

25.    Elliott also requires all of its employees to abide by the company's Outside Business Activities Policy as an express condition of their employment with Elliott.

26.    Pursuant to Elliott's Outside Business Activities Policy, employees are expressly prohibited from engaging in or performing any outside business activities while working for Elliott:

> [E]mployees may not engage in any outside business activities whatsoever, other than rendering services to the Elliott. Any questions regarding what constitutes a "business activity" should be discussed directly with the Chief Compliance Officer.

**III.    <u>Cedar Hill Spearheads A Conspiracy To Steal The Software</u>**

27.    Cedar Hill is in the business of managing long and short equity funds focusing on global financial stocks, including CDOs. In this regard, Cedar Hill competes with Elliott in its trading activities.

28.    In its marketing materials, Cedar Hill promotes itself to investors as having a "tactical trading edge" in the market due, in part, to its "proprietary systems and disciplined trading." Cedar Hill also boasts that "the core of the investment process" is its "independent, primary research."

29.    In or around October 2007, Cedar Hill desired to obtain a sophisticated software computer program that would enable it to better manage its funds, including its CDO trading business, and to make more informed and educated trading decisions. Its goal was to have a new software program developed and implemented by year-end so that it could use the program for trading decisions beginning in January 2008.

30.     Upon information and belief, in or around October 2007, Cedar Hill contacted Delta Hedge Systems, Inc. ("Delta Hedge"), a hedge fund consulting firm, about who might assist Cedar Hill with the development of such a software application.  Upon information and belief, Delta Hedge contacted S Tech and pitched the prospective business opportunity to Hirst, an S Tech principal.

31.     Hirst, who had a long-standing relationship with Srinivasan, knew Srinivasan was working on a program at Elliott that was substantially similar to the program Cedar Hill wanted to acquire.  Upon information and belief, Hirst recommended Srinivasan as the prime candidate to develop Cedar Hill's software application.

32.     On October 30, 2007, Emil Woods ("Woods"), Cedar Hill's Chief Portfolio Manager & Risk Manager, e-mailed John Pike ("Pike"), a Portfolio Manager he knew at Elliott, to ask for an employment reference for Srinivasan.  In his e-mail, Woods wrote that he believed Srinivasan had "built an intex technology capable of taking in loan level default/prepay curves."

33.     Woods' e-mail was forwarded to Schorin and then to Amit Basu ("Basu"), who is the head of Elliott's Applications Development Department and at the time was Srinivasan's supervisor.

34.     Basu met with Srinivasan to inquire whether he was working and/or looking to work with Cedar Hill.  Srinivasan falsely told Basu he was not working for Cedar Hill, that he was happy at Elliott and that a friend had given his name to Cedar Hill without his permission.

35.    In or around the first week of November 2007, Pike called Woods and told him that Srinivasan was a current employee of Elliott and that he could not discuss Srinivasan's work with Woods.

36.    Cedar Hill knew Srinivasan was an employee of Elliott and, upon information and belief, also knew he was subject to a contractual agreement with Elliott that prohibits him from using or disclosing Elliott's confidential and proprietary information, including any knowledge or information regarding Elliott's Software.  Notwithstanding such knowledge, Cedar Hill engaged Srinivasan to assist it in developing a computer application that would perform substantially similar, if not the same, functions as Elliott's Software.

37.    Upon information and belief, Cedar Hill engaged Srinivasan because it knew he had access to Elliott's Software, none of which is or was in the public domain, and knew and believed Srinivasan would rely on and/or use Elliott's confidential and proprietary information to deliver the sought after computer application for Cedar Hill in very short order.

38.    In early November 2007, Srinivasan began working on a computer application for Cedar Hill.  Shortly thereafter, Srinivasan, with Cedar Hill's knowledge and consent, recruited Miah to assist him with the illicit project.

39.    Upon information and belief, Cedar Hill knew that Miah was a consultant working in Elliott's Applications Development Department and that, like Srinivasan, Miah had unfettered access to Elliott's Software.  Cedar Hill also knew and believed Miah would rely on and/or use Elliott's confidential and proprietary information to develop the software Cedar Hill had commissioned.  In addition, upon information and belief, Cedar Hill knew Miah, like Srinivasan, is subject to an agreement that contractually prohibits him from using or disclosing any of Elliott's confidential and proprietary information, including any knowledge or

information regarding Elliott's Software. Notwithstanding such knowledge, Cedar Hill engaged

Miah to assist in the development of a computer application that would perform substantially

similar, if not the same, functions as Elliott's Software.

40.     Beginning in late October or early November 2007, Srinivasan met with

the principals of Cedar Hill on several occasions to discuss the development of the computer

application. Srinivasan's and Miah's primary contact at Cedar Hill was Habib Shahsamand

("Shahsamand"). Upon information and belief, Shahsamand is a senior executive and principal

trader at Cedar Hill.

41.     During this same period, Srinivasan and Miah corresponded with

Shahsamand via e-mail regarding the development of Cedar Hill's computer application.

Srinivasan and Miah kept Shahsamand apprised of their progress, and Shahsamand directed them

how to proceed.

42.     Upon information and belief, at all relevant times, Shahsamand and other

principals at Cedar Hill knew that Srinivasan and Miah were using Elliott's offices, computers

and resources to procure the computer application for Cedar Hill. In fact, during the course of

Elliott's investigation the company learned that Srinivasan and Miah were testing the application

they were "developing" for Cedar Hill using Elliott's computers and network servers. Upon

information and belief, Shahsamand and other principals of Cedar Hill knew, were aware and

countenanced the fact that the illicit work being performed by Srinivasan and Miah was being

conducted at Elliott's offices and during Elliott's business hours.

43.     Srinivasan advised Keith Horn ("Horn"), Elliott's Chief Operating Officer,

that in late 2007, Srinivasan told Shahsamand that he and Miah were unsure they would be able

to complete Cedar Hill's software application. According to Srinivasan, Shahsamand told him

that if he did not complete the final installment of Cedar Hill's application, Shahsamand would "out" Srinivasan by disclosing to Elliott the fact that he and Miah were working for Cedar Hill in violation of the contractual and legal duties each owed to Elliott. Srinivasan told Horn that Shahsamand had "blackmailed" him into completing the application for Cedar Hill by using whatever means necessary.

44.    Beginning in late November 2007, Srinivasan and Miah unlawfully, and without authorization, misappropriated, copied and transferred to Cedar Hill substantial amounts of Elliott's Software in connection with their "development" of a competing application for Cedar Hill. Upon information and belief, Shahsamand knew, understood and/or directed Srinivasan and Miah to gain and/or exceed their authorized access to Elliott's protected computers and copy Elliott's confidential and proprietary information onto the laptops they had been issued in connection with their work at Elliott, as well as onto the personal laptop that Srinivasan purchased for the purpose of their illicit work. Upon information and belief, Shahsamand further knew, understood and/or directed Srinivasan and Miah to e-mail Elliott's trade secrets and confidential and proprietary information to Cedar Hill for its own benefit and use.

45.    In fact, Miah, Cedar Hill's agent and co-conspirator, has issued a sworn Affidavit admitting that he and Srinivasan copied *in excess of fifty percent (50%)* of Elliott's computer source code, executable code and other confidential structural components of the Software -- none of which is in the public domain -- and used it to build the application for Cedar Hill. See Affidavit of Alomgir Miah, sworn to on February 5, 2008, attached hereto as Exhibit B.

46.    Upon information and belief, Elliott's Software has been copied to devices in the possession and control of Cedar Hill and, further, Cedar Hill has used, and continues to use, Elliott's Software and its underlying executable code for purposes of obtaining an unfair competitive advantage in the market.

**IV.    Elliott Unravels Cedar Hill's Conspiracy**

47.    In early January 2008, Srinivasan told Ravi Pazhani ("Pazhani"), a developer in Elliott's Applications Development Department, that he had completed work on a computer application for Cedar Hill that performed the same functions as those performed by the Software developed by Elliott. Srinivasan previously had solicited Pazhani's assistance in developing the computer application for Cedar Hill, but Pazhani declined the offer and warned Srinivasan against doing so. A signed Affidavit by Ravi Pazhani, sworn to on February 7, 2008, testifying to this effect is attached hereto as Exhibit C.

48.    Pazhani knew that neither Srinivasan nor Miah had the technical expertise and know-how necessary to develop such a software application on their own, and especially not within the two-or-three month time frame set by Cedar Hill. Concerned and rightfully suspicious, Pazhani reviewed Elliott's computer system to determine whether any confidential and proprietary information had been misappropriated.

49.    Elliott learned and came to believe that beginning in October 2007, Cedar Hill, acting in concert with Srinivasan, Miah and others, had set in motion a scheme to steal the Software developed by Elliott by (a) misappropriating substantial amounts of the confidential and proprietary computer source code, executable code, structures, processes and other components of the Software that Elliott had developed; (b) encouraging Elliott's employees and consultants to breach their contractual agreements with Elliott; (c) removing from the computer

- 17 -

source code the electronic tag that expressly identified the Software Elliott property; and (d) using Elliott's confidential and proprietary information for the benefit of Cedar Hill.

50.    Elliott further came to the belief that Cedar Hill knew, understood and was aware that, for months, Srinivasan and Miah were spending their time creating and developing a competing computer application for Cedar Hill, rather than focusing their time and energy assisting Elliott to continue to develop, maintain and operate its Software as they were contractually and legally obligated to do. In fact, the results of Elliott's investigation suggest that Cedar Hill encouraged and directed their illicit behavior.

51.    Once Elliott unearthed Cedar Hill's conspiracy, the company took immediate steps to secure its computer network from any further improper invasion by Cedar Hill, Srinivasan, Miah and others. Among other things, Elliott (i) recovered Srinivasan's and Miah's Elliott laptop computers; (ii) secured the computer source code from such laptop computers and placed it into a secure folder in Elliott's offices; and (iii) blocked Srinivasan's and Miah's access to Elliott's computer networks.

52.    Indeed, on January 16, 2008, after terminating Srinivasan's employment, Elliott personnel escorted Srinivasan and Miah to their homes and directed them to collect all Elliott property in their possession, including their Elliott-issued laptops, as well as the personal laptop onto which Srinivasan had copied the Software's source code. During the trip to Srinivasan's house, upon information and belief, Srinivasan spoke with Hirst, who repeatedly directed him to "erase everything." Following that conversation, upon information and belief, Srinivasan called his wife and directed her to leave their house and to take his personal laptop with her in an effort to hide additional evidence of the conspiracy.

53.    Upon arriving at Srinivasan's home, Srinivasan refused to permit his escort to enter.  After waiting outside for approximately ten minutes, Srinivasan began to turn over, in piecemeal fashion, Elliott's property.  Upon information and belief, during this time Srinivasan was attempting to "erase everything" from his Elliott laptop, as he was instructed to do by Hirst.

54.    Srinivasan also told his escort he had "discovered" that his wife had taken his personal laptop from their home.  Although he told Elliott that he downloaded its source code onto his personal laptop and volunteered to turn such personal laptop over to Elliott for inspection, Srinivasan has since refused to do so.  To date, Srinivasan has not returned all of Elliott's confidential and proprietary information to Elliott, including any Elliott property located at Cedar Hill's offices.

55.    Miah, on the other hand, promptly returned to Elliott all Elliott property, including the Elliott laptop computer in his possession.

## V.    Cedar Hill Continues to Use and Misappropriate Elliott's Software

56.    Cedar Hill has not returned any of Elliott's confidential and proprietary information to Elliott, including the Software, despite its implicit obligations under the TRO. Cedar Hill knows and is aware that the TRO specifically requires Srinivasan, Miah and any "*entities acting in concert with them* to return to plaintiff [Elliott] forthwith any and all intellectual property or information technology belonging to plaintiff [Elliott] including, without limitation, the computer code, structures, processes and other components relating to plaintiff [Elliott's] portfolio management computer application"  and restrains such entities from destroying or erasing Elliott's confidential and proprietary information including, but not limited

to, the Software. (emphasis added). A true and correct copy of the TRO issued in the State Action is attached hereto as Exhibit D.

57.    In accordance with the TRO, Cedar Hill, as an entity acting in concert with Srinivasan and Miah, should have returned all of Elliott's property in its possession and should not be erasing or deleting any of Elliott's information technology.

58.    Upon information and belief, Cedar Hill has retained copies of the confidential and proprietary executable code, computer structures, processes and other components of Elliott's Software so that Cedar Hill may continue to use, further develop and maintain the computer application Srinivasan and Miah acquired for it.

59.    Upon information and belief, Cedar Hill, Hirst, Srinivasan and others are continuing to take all possible steps to "erase" their tracks, and are actively deleting all traces of the codes of the Software and other documents that evidence their wrongful conduct.

60.    Upon information and belief, Cedar Hill is actively competing and/or intends to compete improperly against Elliott by using Elliott's confidential and proprietary executable code and other structural components of the Software, thereby obtaining an unfair competitive advantage in the marketplace.

61.    Cedar Hill's wrongful and illegal conduct has resulted, and will continue to result, in immeasurable losses and damages to the integrity of Elliott's Software and business relationships, and has caused, and will continue to cause, irreparable harm to Elliott's business and business reputation.

## COUNT I
## THE COMPUTER FRAUD AND ABUSE ACT
### (Violation of 18 U.S.C. § 1030(a)(2)(C))

62.     Plaintiff incorporates by reference herein all of the allegations contained in paragraphs 1 through 61 of the Verified Complaint as if fully set forth herein.

63.     Elliott is the sole owner of the Software, including without limitation the confidential and proprietary computer source code, executable code, software applications, computer structures, processes and other components of the Software.

64.     Upon information and belief, Cedar Hill knew, understood and/or directed Srinivasan and Miah to misappropriate Elliott's trade secrets and confidential and proprietary information from the Software, download it to their Elliott and personal computers, incorporate it into an application for Cedar Hill and transmit the information to Cedar Hill for its use and benefit.

65.     Upon information and belief, Cedar Hill knew that Srinivasan and Miah either lacked authority or exceeded their authorized access to obtain such information from Elliott's computers and computer systems.

66.     Upon information and belief, Srinivasan and Miah were acting as Cedar Hill's agents when they impinged upon Elliott's property rights and accessed confidential and proprietary information from Elliott's computers and computer systems by dishonest methods.

67.     Cedar Hill is liable because it caused, aided, abetted, counseled, commanded, directed, encouraged, induced and/or procured commission of these violations and has knowingly profited from Srinivasan's and Miah's unauthorized access to Elliott's computer networks and systems.

68.    The computers and computer systems from which Srinivasan and Miah obtained this information, under the direction of Cedar Hill, are "protected computers" pursuant to 18 U.S.C. § 1030(e)(2)(B) because they are used in interstate and/or foreign commerce or communication.

69.    Srinivasan and Miah communicated and transmitted Elliott's confidential and proprietary information to their own laptops and through e-mail correspondence with Cedar Hill between New York and New Jersey.  Therefore, the unlawful conduct involved interstate communications.

70.    Upon information and belief, Cedar Hill intentionally caused damage by impairing the integrity and availability of Elliott's computer source code, executable code, software applications, computer structures, processes and other components of the Software.

71.    Cedar Hill's actions have caused Elliott a loss of more than $5,000 in a one year period, as Elliott has been forced to incur costs for damage assessment and remedial measures.

72.    Cedar Hill's conduct, as described above, has caused Elliott irreparable injury and, unless enjoined, will continue to cause irreparable injury to Elliott's business including, but not limited to, loss of good will, reputation, client relationships, competitive advantage, revenues and profits that are impossible to accurately and fully calculate, all for which Elliott has no adequate remedy at law.

73.    As a direct and proximate result of these acts, Plaintiff has suffered, and continues to suffer, immediate, irreparable and unquantifiable damages.

## COUNT II
## THE COMPUTER FRAUD AND ABUSE ACT
### (Violation of 18 U.S.C. § 1030(a)(4))

74.     Plaintiff incorporates by reference herein all of the allegations contained in paragraphs 1 through 73 of the Verified Complaint as if fully set forth herein.

75.     Elliott is the sole owner of the Software, including without limitation the confidential and proprietary computer source code, executable code, software applications, computer structures, processes and other components of the Software.

76.     Upon information and belief, Cedar Hill knew, understood and/or directed Srinivasan and Miah to misappropriate Elliott's trade secrets and confidential and proprietary information from the Software, download it to their Elliott and personal computers, incorporate it into an application for Cedar Hill and transmit the information to Cedar Hill for its use.

77.     Upon information and belief, Cedar Hill knew that Srinivasan and Miah either lacked authority or exceeded their authorized access to obtain such information from Elliott's computers and computer systems.

78.     Upon information and belief, Srinivasan and Miah were acting as Cedar Hill's agents when they impinged upon Elliott's property rights and accessed confidential and proprietary information from Elliott's computers and computer systems by dishonest methods.

79.     Upon information and belief, Cedar Hill, with the intent to defraud Elliott, encouraged and directed Srinivasan and Miah to act, and by means of such conduct, furthered the intended fraud and obtained valuable information.

80.     Cedar Hill lacked any authority to obtain such information from Elliott's computers and computer systems.

81.    Cedar Hill is liable because it caused, aided, abetted, counseled, commanded, directed, encouraged, induced and/or procured commission of these violations and has knowingly profited.

82.    The computers and computer systems from which Srinivasan and Miah obtained this information, under the direction of Cedar Hill, are "protected computers" pursuant to 18 U.S.C. § 1030(e)(2)(B) because they are used in interstate and/or foreign commerce or communication.

83.    Upon information and belief, Cedar Hill intentionally caused damage by impairing the integrity and availability of Elliott's computer source code, executable code, software applications, computer structures, processes and other components of the Software.

84.    Cedar Hill's actions have caused Elliott a loss of more than $5,000 in a one year period, as Elliott has been forced to incur costs for damage assessment and remedial measures.

85.    Cedar Hill's conduct, as described above, has caused Elliott irreparable injury and, unless enjoined, will continue to cause irreparable injury to Elliott's business including, but not limited to, loss of good will, reputation, client relationships, competitive advantage, revenues and profits that are impossible to accurately and fully calculate, all for which Elliott has no adequate remedy at law.

86.    As a direct and proximate result of these acts, Plaintiff has suffered, and continues to suffer, immediate, irreparable and unquantifiable damages.

## COUNT III
## THE COMPUTER FRAUD AND ABUSE ACT
### (Violation of 18 U.S.C. § 1030(a)(5))

87.    Plaintiff incorporates by reference herein all of the allegations contained in paragraphs 1 through 86 of the Verified Complaint as if fully set forth herein.

88.    Elliott is the sole owner of its Software, including without limitation the confidential and proprietary computer source code, executable code, software applications, computer structures, processes and other components of the Software.

89.    Upon information and belief, Cedar Hill knew, understood and/or directed Srinivasan and Miah to misappropriate Elliott's trade secrets and confidential and proprietary information from the Software, download it to their Elliott and personal computers, incorporate it into an application for Cedar Hill and transmit the information to Cedar Hill for its use.

90.    Upon information and belief, Cedar Hill knew that Srinivasan and Miah either lacked authority or exceeded their authorized access to obtain such information from Elliott's computers and computer systems.

91.    Upon information and belief, Srinivasan and Miah were acting as Cedar Hill's agents when they impinged upon Elliott's property rights and accessed confidential and proprietary information from Elliott's computers and computer systems by dishonest methods.

92.    Cedar Hill is liable because it caused, aided, abetted, counseled, commanded, directed, encouraged, induced and/or procured commission of these violations and has knowingly profited.

93.    The computers and computer systems from which Srinivasan and Miah obtained this information, under the direction of Cedar Hill, are "protected computers" pursuant

to 18 U.S.C. § 1030(e)(2)(B) because they are used in interstate and/or foreign commerce or communication.

94.    Upon information and belief, Cedar Hill intentionally caused damage by impairing the integrity and availability of Elliott's computer source code, executable code, software applications, computer structures, processes and other components of the Software.

95.    Cedar Hill's actions have caused Elliott a loss of more than $5,000 in a one year period, as Elliott has been forced to incur costs for damage assessment and remedial measures.

96.    Cedar Hill's conduct, as described above, has caused Elliott irreparable injury and, unless enjoined, will continue to cause irreparable injury to Elliott's business including, but not limited to, loss of good will, reputation, client relationships, competitive advantage, revenues and profits that are impossible to accurately and fully calculate, all for which Elliott has no adequate remedy at law.

97.    As a direct and proximate result of these acts, Plaintiff has suffered, and continues to suffer, immediate, irreparable and unquantifiable damages.

## COUNT IV
## <u>MISAPPROPRIATION OF TRADE SECRETS</u>

98.    Plaintiff incorporates by reference herein all of the allegations contained in paragraphs 1 through 97 of the Verified Complaint as if fully set forth herein.

99.    Elliott's Software and all of its source code, executable code, software applications, structures, processes and other components constitute confidential, proprietary trade secrets, the sole ownership of which rests with Elliott.

100.    Elliott undertakes extensive efforts to maintain the confidentiality of the Software including, among other things, (i) requiring all employees and consultants to sign IP

Agreements prohibiting the disclosure of its confidential and proprietary business information and trade secrets; (ii) labeling all of the computer source code underlying the Software with an electronic "tag" expressly identifying it as the property of Elliott; (iii) prohibiting its employees from engaging in outside business activities that would conflict with their obligations to Elliott; and (iv) limiting access to the Software to only those Elliott employees and consultants who have a legitimate business need for such access.

101.    Elliott's Software is not disseminated to the public at large, and none of this information is readily discoverable by Elliott's competitors.

102.    Upon information and belief, Cedar Hill knew that Srinivasan and Miah had access to Elliott's confidential and proprietary information, including, but not limited to, Elliott's Software.

103.    Upon information and belief, Cedar Hill knew that Srinivasan and Miah were contractually prohibited from using or disclosing the source code, executable code, software applications, structures, processes and other components of the Software.

104.    Upon information and belief, Cedar Hill directed Srinivasan and Miah to breach their contractual agreements with Elliott and knew, understood and/or directed them to copy Elliott's trade secrets and confidential and proprietary information from the Software, download it to their Elliott and personal computers, incorporate it into an application for Cedar Hill and transmit the information to Cedar Hill for its use.

105.    Upon information and belief, Srinivasan and Miah were acting as Cedar Hill's agents when they impinged upon Elliott's property rights and accessed confidential and proprietary information from Elliott's computers and computer systems by dishonest methods.

106.    By virtue of the foregoing, Cedar Hill has misappropriated, and continues to misappropriate and wrongfully use, Elliott's confidential, proprietary trade secrets because it caused, aided, abetted, counseled, commanded, directed, encouraged, induced and/or procured commission of these violations and has knowingly profited from them.

107.    Cedar Hill's conduct, as described above, has caused Elliott irreparable injury and, unless enjoined, will continue to cause irreparable injury to Elliott's business including, but not limited to, loss of good will, reputation, client relationships, competitive advantage, revenues and profits that are impossible to accurately and fully calculate, all for which Elliott has no adequate remedy at law.

108.    As a direct and proximate result of these acts, Plaintiff has suffered, and continues to suffer, immediate, irreparable and unquantifiable damages.

## COUNT V
## CONVERSION

109.    Plaintiff incorporates by reference herein all of the allegations contained in paragraphs 1 through 108 of the Verified Complaint as if fully set forth herein.

110.    By virtue of Cedar Hill's misappropriation and theft of the confidential and proprietary computer source code, executable code, software applications, structures, processes and other components of the Software developed by Elliott, Cedar Hill knowingly, intentionally and without authority exercised control over Elliott's confidential, proprietary trade secrets and interfered with Elliott's superior and exclusive right of possession and property interest in the Software and related components.

111.    Cedar Hill's agents, Srinivasan and Miah, executed IP Agreements with Elliott that contained a provision which required them to return to Elliott, on demand and/or on

their terminations of employment or consultancy, any and all copies (whether physical or electronic) of documents including any Protected Information.

112.    Elliott has demanded the return of the converted property and information technology, but Srinivasan, Cedar Hill's agent, continues to be in possession of, has wrongfully refused to return, and has unlawfully used and/or intends to use the source code, executable code, software applications, structures, processes and other components of the Software for the benefit of Cedar Hill.

113.    Upon information and belief, Cedar Hill also continues to be in possession of, has wrongfully refused to return, and has unlawfully used and continues to unlawfully use the executable code, software applications, structures, processes and other components of the Software for its benefit.

114.    By virtue of the foregoing conduct, Cedar Hill has knowingly, intentionally and wrongfully converted the executable code, software applications, structures, processes and other components of Elliott's Software for its own use and benefit.

115.    Cedar Hill's conduct, as described above, has caused Elliott irreparable injury and, unless enjoined, will continue to cause irreparable injury to Elliott's business including, but not limited to, loss of good will, reputation, client relationships, competitive advantage, revenues and profits that are impossible to accurately and fully calculate, all for which Elliott has no adequate remedy at law.

116.    As a direct and proximate result of these acts, Plaintiff has suffered, and continues to suffer, immediate, irreparable and unquantifiable damages.

**COUNT VI**
**TORTIOUS INTERFERENCE WITH CONTRACT**

117.    Plaintiff incorporates by reference herein all of the allegations contained in paragraphs 1 through 116 of the Verified Complaint as if fully set forth herein.

118.    Upon information and belief, Cedar Hill knew that Srinivasan and Miah entered into IP Agreements with Elliott which, among other things, prohibited Srinivasan and Miah from, directly or indirectly, copying, utilizing, exploiting or communicating Elliott's confidential and proprietary information to a third party.  The IP Agreements are valid and enforceable contractual agreements.

119.    Upon information and belief, Cedar Hill knowingly, intentionally and wrongfully induced Srinivasan and Miah to breach their contractual obligations to Elliott by knowing, understanding and/or directing them to copy Elliott's trade secrets and confidential and proprietary information from the Software, download it to their Elliott and personal computers, incorporate it into an application for Cedar Hill and transmit the information to Cedar Hill for its use.

120.    Based on the foregoing, Cedar Hill has wrongfully interfered with Elliott's contractual relationships with Srinivasan and Miah.

121.    Cedar Hill's wrongful interference with Elliott's contracts is without any legal or business justification.

122.    Cedar Hill's conduct, as described above, has caused Elliott irreparable injury and, unless enjoined, will continue to cause irreparable injury to Elliott's business including, but not limited to, loss of good will, reputation, client relationships, competitive advantage, revenues and profits that are impossible to accurately and fully calculate, all for which Elliott has no adequate remedy at law.

- 30 -

123.   As a direct and proximate result of these acts and Cedar Hill's tortious interference, Plaintiff has suffered, and continues to suffer, immediate, irreparable and unquantifiable damages.

## COUNT VII
## QUANTUM MERUIT

124.   Plaintiff incorporates by reference herein all of the allegations contained in paragraphs 1 through 123 of the Verified Complaint as if fully set forth herein.

125.   Cedar Hill has received and continues to receive a substantial economic benefit and competitive edge by virtue of using the executable code, software applications, structures, processes and other components underlying Elliott's Software in its own computer application.

126.   Cedar Hill only recognized these benefits because it unlawfully misappropriated Elliott's confidential and proprietary information for its own competitive advantage.

127.   It is inequitable and unjust for Cedar Hill to have recognized the benefit of using Elliott's confidential and proprietary information without compensating Elliott for same.

128.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, and continues to suffer, immediate, irreparable and unquantifiable damages.

## COUNT VIII
## UNFAIR COMPETITION

129.   Plaintiff incorporates by reference herein all of the allegations contained in paragraphs 1 through 128 of the Verified Complaint as if fully set forth herein.

130.   By virtue of the foregoing conduct, Cedar Hill has engaged in unfair competition against Elliott and continues to unfairly compete against Elliott. Cedar Hill's acts of unfair competition include, but are not limited to, Cedar Hill's (i) misappropriation of Elliott's

confidential, proprietary trade secrets; (ii) wrongful interference with Elliott's contractual

relationships with Srinivasan and Miah; and (iii) unlawful use and disclosure of Elliott's

confidential, proprietary trade secrets for its own benefit.

131.    Cedar Hill's conduct, as described above, has caused Elliott irreparable

injury and, unless enjoined, will continue to cause irreparable injury to Elliott's business

including, but not limited to, loss of good will, reputation, client relationships, competitive

advantage, revenues and profits that are impossible to accurately and fully calculate, all for

which Elliott has no adequate remedy at law.

132.    As a direct and proximate result of these acts, Plaintiff has suffered, and

continues to suffer, immediate, irreparable and unquantifiable damages.

**COUNT IX**
**AIDING AND ABETTING THE BREACH OF DUTY OF LOYALTY**

133.    Plaintiff incorporates by reference herein all of the allegations contained in

paragraphs 1 through 132 of the Verified Complaint as if fully set forth herein.

134.    Cedar Hill knew or should have known that Srinivasan and Miah, an

employee and consultant of Elliott, respectively, each owed an undivided duty of loyalty to

Elliott by virtue of their relationships with Elliott.

135.    Upon information and belief, Cedar Hill knowingly, intentionally and

improperly induced Srinivasan and Miah to breach their respective duties of loyalty by directly

or indirectly encouraging or requesting that they copy the computer source code, executable

code, software applications, structures, processes and other components of Elliott's Software and

incorporate same into a competing computer application for Cedar Hill while working for Elliott.

136.    Upon information and belief, Cedar Hill knowingly and wrongfully

facilitated, participated and/or assisted Srinivasan's and Miah's breach of their respective duties

of loyalty by directly or indirectly encouraging and directing them to create and develop a

competing application for Cedar Hill during Elliott's business hours and using Elliott's computers

and resources, when their time and energy should have been spent working solely for Elliott's

benefit.

137.    Cedar Hill's inducement, facilitation, participation and assistance in the

breach of Srinivasan's and Miah's respective duties of loyalty was essential to the

accomplishment of Cedar Hill's plan to misappropriate Elliott's Software and to wrongfully use

Elliott's confidential and proprietary information for its own benefit. Cedar Hill directly

benefited from these actions and contributed to Elliott's injury.

138.    Cedar Hill's conduct, as described above, has caused Elliott irreparable

injury and, unless enjoined, will continue to cause irreparable injury to Elliott's business

including, but not limited to, loss of good will, reputation, client relationships, competitive

advantage, revenues and profits that are impossible to accurately and fully calculate, all for

which Elliott has no adequate remedy at law.

139.    As a direct and proximate result of these acts, Plaintiff has suffered, and

continues to suffer, immediate, irreparable and unquantifiable damages.

## COUNT X
## ACCOUNTING

140.    Plaintiff incorporates by reference herein all of the allegations contained in

paragraphs 1 through 139 of the Verified Complaint as if fully set forth herein.

141.    Cedar Hill has illegally and improperly misappropriated, copied and

disclosed Elliott's confidential and proprietary information, including but not limited to the

Software.

142.    Elliott has been damaged by virtue of Cedar Hill's interference with its contractual relations.

143.    Elliott has no adequate remedy at law.

144.    By reason of the foregoing, Elliott is entitled to an accounting of all monies, profits and benefits received by Cedar Hill relating in any way to Elliott's confidential and proprietary information, including but not limited to the computer source code, executable code, software applications, structures, processes and other components of the Software.

**WHEREFORE,** Plaintiff requests that the Court issue the following relief:

a.    Granting an injunction temporarily, preliminarily and permanently enjoining Cedar Hill, its agents, employees and representatives, and all persons or entities working in concert with any of them, from using in any way, directly or indirectly, or disclosing to any person or entity, Elliott's confidential, proprietary and trade secret information including, but not limited to, any computer source code, executable code, software applications, computer structures, processes and other components of the Software, as well as any computer applications developed by or for Cedar Hill that contain any of Elliott's confidential, proprietary and trade secret information;

b.    An Order requiring Cedar Hill to immediately return any and all of Elliott's confidential, proprietary and trade section information, including without limitation, the Software, and directing that Cedar Hill is not to retain any copies thereof;

c.    Granting an injunction temporarily, preliminarily and permanently enjoining Cedar Hill, its agents, employees and representatives, and all persons or entities

- 34 -

working in concert with any of them, directly or indirectly, from interfering with the contractual

relationships between Elliott and its agents, employees and representatives;

        d.     An Order mandating that Cedar Hill, its agents, employees and

representatives, and all persons or entities working in concert with any of them, preserve and not

delete, erase, allow to spoliate, destroy, discard, obscure or otherwise dispose of any documents,

electronic or otherwise, that in any way concern Elliott's confidential, proprietary and trade

secret information;

        e.     An Order granting Elliott leave to immediately commence discovery,

including depositions, in aid of preliminary injunction proceedings before the Court;

        f.     Awarding damages to Elliott, in an amount to be proven at trial;

        g.     Awarding Elliott punitive damages in an amount to be proven at trial;

        h.     Awarding Elliott its attorneys' fees, costs of suit and interest;

        i.     An Order granting Elliott an accounting of all monies, profits and benefits

received by the Defendants relating in any way to Elliott's confidential and proprietary

information including, but not limited to, the Software; and

        j.     Awarding Elliott such other and further relief as the Court may deem just

and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury as to any and all claims so triable.

DATED:        New York, New York
              February 26, 2008

                            KASOWITZ, BENSON, TORRES
                            & FRIEDMAN LLP

                            By:  _____
                                 Eric J. Wallach, Esq.
                                 Blythe E. Lovinger, Esq.
                                 Joseph A. Piesco, Jr., Esq.

                            Attorneys for Plaintiff
                            Elliott Management Corporation
                            1633 Broadway
                            New York, New York 10019
                            (212) 506-1700

## VERIFICATION

The foregoing Verified Complaint for Injunctive Relief and Damages has been reviewed

by me and the allegations contained therein are true, complete and accurate, except with respect

to those allegations that are asserted upon information and belief, which allegations I believe are

accurate to the best of my knowledge and belief.

ELLIOTT MANAGEMENT CORPORATION

By: _____

Title: Chief Operating Officer

Sworn to me this 25th day
of February, 2008

Notary Public
OKSANA BITETTI
Notary Public, State of New York
No. 01BI6137693 Qualified in Richmond County
Certificate Filed in New York County
Commission Expires December 05, 20__

# Exhibit A

# ELLIOTT MANAGEMENT CORPORATION
## INFORMATION PROTECTION AGREEMENT

INFORMATION PROTECTION AGREEMENT ("**Agreement**") dated as of _05/01/06_ between _RAGU RAMAN SRINIVASAN_ (the "**Employee**"), residing at _53 VARUZCH ROAD, WESTand_ _WINDSOR_ Elliott Management Corporation, a Delaware corporation ("**Management**") with offices at 712 Fifth Avenue, New York, New York.

## RECITALS

A.      Employee desires to be in the employ of Management.

B.      As an employee of Management, Employee may perform services on Management's behalf for a number of companies with whom Management is related (either by affiliation, contractual relationship, or otherwise). Such companies include, without limitation, Elliott Associates, L.P., Manchester Securities Corp., Elliott Capital Advisors, L.P., Elliott Special GP, LLC, Braxton Associates, Inc., Braxton Inc., Elliott International, L.P., Elliott International Limited, Elliott International Capital Advisors, Inc., Elliott Advisors (UK) Limited, Elliott Advisors (HK) Limited, Elliott Capital (HK) Limited, and the respective predecessors, subsidiaries and affiliates of each of the foregoing (all of the foregoing, together with Management, being sometimes referred to collectively as the "**Companies**" and each individually as a "**Company**").

C.      Management may provide services for some or all of the Companies.

D.      The Companies engage in various portfolio management, advisory and/or trading activities. In connection with the foregoing, they develop and/or utilize information that is considered to be proprietary and/or confidential information of one or more of the Companies. Such confidential and/or proprietary information is sometimes hereinafter referred to as the "**Protected Information.**"

E.      In connection with performing services for and on behalf of Management, Employee may develop and/or will have access to Protected Information.

## AGREEMENT

In consideration of the foregoing, and other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.      Protected Information includes, without limitation, (i) information related to the investment or trading performance of any of the Companies; (ii) information relating to any investment position, contract, asset, liability or obligation (whether held "long" or "short") ("**Position**"), and any analysis and/or strategy relating to any such Position; (iii) the identity of any investors in or shareholders of any of the Companies; (iv) information that is designated, expressly or by implication, by any of the Companies as confidential or proprietary information; and (v) any other information of a type customarily considered confidential or proprietary by persons engaged in portfolio management and/or trading activities. Notwithstanding the foregoing, Protected Information does not include information to the extent such information is in the public domain or is otherwise commonly known to others in the industry, except to the extent that such portions (if any) of such information enter the public domain or become commonly known as a result of Employee's breach of this Agreement.

2.      Protected Information (whether made available to the Employee or developed by the Employee while employed by Management) is the property of the Companies. Employee agrees that Protected Information shall be kept confidential by the Employee, and shall not be, directly or indirectly, copied, utilized or exploited by him or communicated to any third person (except as required in connection with his performance of services for or on behalf of Management, or except as otherwise required by law).

3.    On demand made by any time by Management, Employee shall return to Management any and all copies (whether physical or electronic) of documents including any Protected Information.

4.    The Employee shall not, during his employment by Management and for a two-year period commencing on the date of termination of his employment with Management (irrespective of how such termination may come about)(the "Employee Protected Period"), directly or indirectly solicit or induce in any manner any individual employed or engaged by any of the Companies at the time of such solicitation or inducement, or employed or engaged by any of the Companies at any time during the two-year period prior to the termination of Employee's employment with Management ("Protected Employee"), (i) to resign from being employed by or cease rendering services to Management; and/or (ii) to directly or indirectly enter into the employment of or render any services for any person or entity that the Employee is or is to be directly or indirectly employed by or rendering services for. In addition, during the Employee Protected Period, Employee shall not become employed by or render services to any other person or entity if (x) one or more Protected Employees are employed by or are rendering services to such other person or entity and (y) the Employee would be working with or for such Protected Employee in connection with proprietary trading activities, portfolio advisory/management services and/or administrative/back office services related to the foregoing.

5.    Employee acknowledges that the provisions of paragraphs 1 through 4 above are binding upon him both during and after the term of his employment by Management, regardless of the reason or cause, if any, for such termination.

6.    Employee acknowledges that the foregoing provisions of this Agreement will not diminish his ability to earn a livelihood or create or impose upon him any undue hardship. Employee further acknowledges that any breach of the foregoing provisions of this Agreement will cause irreparable injury to Management and the Companies. Accordingly, Employee agrees that Management and the Companies are entitled to relief by way of restraining order or injunction against any breach or threatened breach of the foregoing provisions of this Agreement, in addition to and not in lieu of any other rights which it or they may have at law or under this Agreement.

7.    Employee further acknowledges that, in the event that Employee breaches the provisions of paragraphs 1 through 4 of this Agreement, the Companies will suffer damage but the amount of the damage may be difficult to ascertain at the time of such breach. In addition, Employee acknowledges that it would be unfair for him to benefit as a result of any breach of the foregoing provisions of this Agreement. Accordingly, Employee agrees that, in addition to any other rights that Management or the Company may have, the Employee shall account for, and pay to Management and the Companies an amount equal to, the compensation, profit or gain received or receivable, directly or indirectly, by the Employee arising out of or relating to any material breach of the provisions of paragraphs 1 through 4 of this Agreement. This remedy is in addition to, and not in lieu of, any other rights or remedies available to Management or the Companies under this Agreement or at law.

8.    Employee agrees to comply with Management's procedures and policies from time to time in effect. Such procedures and policies are set forth in part in Management's Employee Handbook.

9.    Without limiting the foregoing, Employee agrees to comply with Management's Trading Securities Policy and Outside Business Activities Policy, as such policies may be changed from time to time (the "**Employee Conduct Policies**"). Employee acknowledges that Management and the Companies would suffer damages if he fails to comply with the Employee Conduct Policies, but the amount of such damage may be difficult to determine at the time of such breach. In addition, it would be unfair for Employee to benefit from a material breach of either of the Employee Conduct Policies. Therefore, Employee agrees that, with respect to any material breach of either of the Employee Conduct Policies, Employee shall account for, and pay over to the Companies, any and all compensation, profit or gain received or receivable, directly or indirectly, as a result of any such breach of either of such policies. This remedy is in addition to, and not in lieu of, any other rights or remedies available to Management or the Companies under this Agreement or at law.

2

10.    Employee agrees that he shall not comment upon or provide information about Management or any of the Companies, or any of its or their business or personnel, unless and to the extent Employee is specifically directed to do so by an authorized officer of Management.

11.    If any provision of this Agreement shall be held or determined to be unenforceable, the balance of this Agreement shall nevertheless continue in full force and effect, unaffected by such holding or determination. In addition, in any such event, Employee and the Companies agree that it is their intention and agreement that any such provision that is held or determined to be unenforceable, as written, shall nonetheless be in force and binding to the fullest extent permitted by law as though such provision had been written in such a manner and to such an extent as to be enforceable under the circumstances.

12.    No amendment of this Agreement shall be effective unless in writing and executed by the Employee and a duly authorized officer of Management.  This Agreement does not constitute an employment agreement.  Nothing contained herein shall prevent Employee or Management from terminating Employee's employment at any time, for any reason.  This Agreement shall be governed by the internal laws of the State of New York and shall be binding upon and inure to the benefit of Management, the Companies and the Employee, and their respective successors and assigns.  The use of the masculine gender herein is for convenience and shall be deemed to include the feminine gender.  This Agreement may be signed in counterpart.  THE PARTIES WAIVE ANY RIGHT TO A TRIAL BY JURY.

13.    All remedies under this agreement are cumulative, in addition to any remedies otherwise available, and may be applied in any order.

14.    The waiver by any of the Companies of a breach of any provision of this Agreement by the Employee shall not operate or be construed as a waiver of any subsequent breach.

IN WITNESS WHEREOF, the Employee has executed this Agreement on the date written below.

Date: _____05/01/06_____          _____
                                  Signature of Employee

Print Name:     RAGHURAMAN  SRINIVASAN

Print Address:  53 WARWICK ROAD

                WEST WINDSOR, NJ 08550

Print Position: SOFTWARE  PROGRAMMER

AGREED TO AND ACCEPTED BY:
ELLIOTT MANAGEMENT CORPORATION

By:_____

3

SSCHUL\89913.5 - 2/10/05

## ELLIOTT MANAGEMENT CORPORATION
## INFORMATION PROTECTION AGREEMENT

INFORMATION PROTECTION AGREEMENT ("**Agreement**") dated as of 03/27/07 between Alomgir Miah (the "**Consultant**"), residing at 280 Marin, NJ - 07802 and Elliott Management Corporation, a Delaware corporation ("**Management**") with offices at 712 Fifth Avenue, New York, New York.

### RECITALS

A.    Consultant desires to be in the employ of Management.

B.    As a consultant of Management, Consultant may perform services on Management's behalf for a number of companies with whom Management is related (either by affiliation, contractual relationship, or otherwise). Such companies include, without limitation, Elliott Associates, L.P., Manchester Securities Corp., Elliott Capital Advisors, L.P., Elliott Special GP, LLC, Braxton Associates, Inc., Braxton Inc., Elliott International, L.P., Elliott International Limited, Elliott International Capital Advisors, Inc., Elliott Advisors (UK) Limited, Elliott Advisors (HK) Limited, Elliott Capital (HK) Limited, and the respective predecessors, subsidiaries and affiliates of each of the foregoing (all of the foregoing, together with Management, being sometimes referred to collectively as the "**Companies**" and each individually as a "**Company**").

C.    Management may provide services for some or all of the Companies.

D.    The Companies engage in various portfolio management, advisory and/or trading activities. In connection with the foregoing, they develop and/or utilize information that is considered to be proprietary and/or confidential information of one or more of the Companies. Such confidential and/or proprietary information is sometimes hereinafter referred to as the "**Protected Information.**"

E.    In connection with performing services for and on behalf of Management, Consultant may develop and/or will have access to Protected Information.

### AGREEMENT

In consideration of the foregoing, and other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.    Protected Information includes, without limitation, (i) information related to the investment or trading performance of any of the Companies; (ii) information relating to any investment position, contract, asset, liability or obligation (whether held "long" or "short") ("**Position**"), and any analysis and/or strategy relating to any such Position; (iii) the identity of any investors in or shareholders of any of the Companies; (iv) information that is designated, expressly or by implication, by any of the Companies as confidential or proprietary information; and (v) any other information of a type customarily considered confidential or proprietary by persons engaged in portfolio management and/or trading activities. Notwithstanding the foregoing, Protected Information does not include information to the extent such information is in the public domain or is otherwise commonly known to others in the industry, except to the extent that such portions (if any) of such information enter the public domain or become commonly known as a result of Consultant's breach of this Agreement.

2.    Protected Information (whether made available to the Consultant or developed by the Consultant while employed by Management) is the property of the Companies. Consultant agrees that Protected Information shall be kept confidential by the Consultant, and shall not be, directly or indirectly, copied, utilized or exploited by him or communicated to any third person (except as required in connection with his performance of services for or on behalf of Management, or except as otherwise required by law).

3.     On demand made by any time by Management, Consultant shall return to Management any and all copies (whether physical or electronic) of documents including any Protected Information.

4.     The Consultant shall not, during his employment by Management and for a two-year period commencing on the date of termination of his employment with Management (irrespective of how such termination may come about)(the "Consultant Protected Period"), directly or indirectly solicit or induce in any manner any individual employed or engaged by any of the Companies at the time of such solicitation or inducement, or employed or engaged by any of the Companies at any time during the two-year period prior to the termination of Consultant's employment with Management ("Protected Employee"), (i) to resign from being employed by or cease rendering services to Management; and/or (ii) to directly or indirectly enter into the employment of or render any services for any person or entity that the Consultant is or is to be directly or indirectly employed by or rendering services for. In addition, during the Consultant Protected Period, Consultant shall not become employed by or render services to any other person or entity if (x) one or more Protected Employees are employed by or are rendering services to such other person or entity and (y) the Consultant would be working with or for such Protected Employee in connection with proprietary trading activities, portfolio advisory/management services and/or administrative/back office services related to the foregoing.

5.     Consultant acknowledges that the provisions of paragraphs 1 through 4 above are binding upon him both during and after the term of his employment by Management, regardless of the reason or cause, if any, for such termination.

6.     Consultant acknowledges that the foregoing provisions of this Agreement will not diminish his ability to earn a livelihood or create or impose upon him any undue hardship. Consultant further acknowledges that any breach of the foregoing provisions of this Agreement will cause irreparable injury to Management and the Companies. Accordingly, Consultant agrees that Management and the Companies are entitled to relief by way of restraining order or injunction against any breach or threatened breach of the foregoing provisions of this Agreement, in addition to and not in lieu of any other rights which it or they may have at law or under this Agreement.

7.     Consultant further acknowledges that, in the event that Consultant breaches the provisions of paragraphs 1 through 4 of this Agreement, the Companies will suffer damage but the amount of the damage may be difficult to ascertain at the time of such breach. In addition, Consultant acknowledges that it would be unfair for him to benefit as a result of any breach of the foregoing provisions of this Agreement. Accordingly, Consultant agrees that, in addition to any other rights that Management or the Company may have, the Consultant shall account for, and pay to Management and the Companies an amount equal to, the compensation, profit or gain received or receivable, directly or indirectly, by the Consultant arising out of or relating to any material breach of the provisions of paragraphs 1 through 4 of this Agreement. This remedy is in addition to, and not in lieu of, any other rights or remedies available to Management or the Companies under this Agreement or at law.

8.     Consultant agrees to comply with Management's procedures and policies from time to time in effect. Such procedures and policies are set forth in part in Management's Consultant Handbook.

9.     Without limiting the foregoing, Consultant agrees to comply with Management's Trading Securities Policy and Outside Business Activities Policy, as such policies may be changed from time to time (the "**Consultant Conduct Policies**"). Consultant acknowledges that Management and the Companies would suffer damages if he fails to comply with the Consultant Conduct Policies, but the amount of such damage may be difficult to determine at the time of such breach. In addition, it would be unfair for Consultant to benefit from a material breach of either of the Consultant Conduct Policies. Therefore, Consultant agrees that, with respect to any material breach of either of the Consultant Conduct Policies, Consultant shall account for, and pay over to the Companies, any and all compensation, profit or gain received or receivable, directly or indirectly, as a result of any such breach of either of such policies. This remedy is in addition to, and not in lieu of, any other rights or remedies available to Management or the Companies under this Agreement or at law.

2

10.     Consultant agrees that he shall not comment upon or provide information about Management or any of the Companies, or any of its or their business or personnel, unless and to the extent Consultant is specifically directed to do so by an authorized officer of Management.

11.     If any provision of this Agreement shall be held or determined to be unenforceable, the balance of this Agreement shall nevertheless continue in full force and effect, unaffected by such holding or determination. In addition, in any such event, Consultant and the Companies agree that it is their intention and agreement that any such provision that is held or determined to be unenforceable, as written, shall nonetheless be in force and binding to the fullest extent permitted by law as though such provision had been written in such a manner and to such an extent as to be enforceable under the circumstances.

12.     No amendment of this Agreement shall be effective unless in writing and executed by the Consultant and a duly authorized officer of Management. This Agreement does not constitute an employment agreement. Nothing contained herein shall prevent Consultant or Management from terminating Consultant's employment at any time, for any reason. This Agreement shall be governed by the internal laws of the State of New York and shall be binding upon and inure to the benefit of Management, the Companies and the Consultant, and their respective successors and assigns. The use of the masculine gender herein is for convenience and shall be deemed to include the feminine gender. This Agreement may be signed in counterpart. THE PARTIES WAIVE ANY RIGHT TO A TRIAL BY JURY.

13.     All remedies under this agreement are cumulative, in addition to any remedies otherwise available, and may be applied in any order.

14.     The waiver by any of the Companies of a breach of any provision of this Agreement by the Consultant shall not operate or be construed as a waiver of any subsequent breach.

IN WITNESS WHEREOF, the Consultant has executed this Agreement on the date written below.

Date:  _03/27/07_____          _Alomgir_____
                                          Signature of Consultant

              Print Name:      _ALOMGIR   MIAH._____

              Print Address:   _712  5th  Ave,_____

                               _New York - 10019_____

              Print Position:  _IT Consultant_____


AGREED TO AND ACCEPTED BY:
ELLIOTT MANAGEMENT CORPORATION

By: _____

3

# Exhibit B

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ELLIOTT MANAGEMENT CORPORATION,                :
                                               :
                              Plaintiff,        :        Case No. 600239/2008
                                               :
                  - against -                   :        **AFFIDAVIT OF**
                                               :        **ALOMGIR MIAH**
ALAN HIRST, RAGUMARN SRINIVASAN, S TECH        :
and ALOMGIR MIAH,                              :
                                               :
                              Defendants.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF NEW YORK       )

ALOMGIR MIAH, being duly sworn, deposes and says:

1.     I am presently a full-time consultant for Elliott Management Corporation

("Management"), and have served in this capacity, working in Management's

Applications Development Department, since March 2007. This affidavit is true and

accurate in all respects.

2.     One of my principal responsibilities at Management has included

implementing developments regarding, maintaining, and assisting with the operation of an

application that enables Management to manage a portfolio of various kinds of bonds

including asset-backed securities and packages of mortgages and other loans (the

"Ap plication"). The analytical features of the Application permit Management to organize

and analyze large amounts of data relating to the underlying loans obtained primarily from

commercial databases, to perform scenario analyses for these bonds, to project their

performances in varied market conditions, and to display and manage the results of the analyses along with other relevant information. The Application is designed to assist Management in making educated trading decisions.

3.    Ragumarn Srinivasan, a defendant in this action and, until recently, a full-time employee in Management's Applications Development Department, also implemented developments to, maintained, and assisted with the operation of the Application. Other than the work which I did during the ten-month period working for Management, I was not involved in the development of the Application.

4.    I am aware that the development of the Application at Management involved the work of at least three people over at least two years, and that the Application, owned by Management, is complex, highly sophisticated, confidential and proprietary to Management. Based upon my conversations and interactions with him, I believe that Mr. Srinivasan is aware of the foregoing as well.

5.    In or about October 2007, defendants S Tech and one of its principals, Alan Hirst, contacted Mr. Srinivasan, whom Mr. Hirst knew had access to Management's Application, to help design and implement a software application for Cedar Hill Capital Partners, L.L.C. or one of its affiliates (the "Ot her Fund") that would perform very similar functions as does the Application.

6.    Mr. Srinivasan, with my help, copied computer source code and other critical structural components of the Application from Management and used them to build the application for S Tech, Mr. Hirst and the Other Fund over the course of two months in late 2007. Mr. Srinivasan and I used in excess of fifty percent (50%) of Management's

2

proprietary code and other confidential structural components of the Application – none of which is in the public domain – in order to try to meet the quickly approaching deadline within which to complete the project for the Other Fund.  Mr. Srinivasan and I met with individuals at the office of the Other Fund on a few occasions (and Mr. Hirst and I met with individuals at the office of the Other Fund on one occasion), developed the application for the Other Fund on Management laptop computers and elsewhere, and tested the application for the Other Fund on Management's  servers.  All significant work on the application for the Other Fund was completed by Mr. Srinivasan and me, and we could not have done this work in so short a time period, or perhaps at all, had we not used the Application's source code and other structural components from Management.

7.    I believe, based upon my conversations and interactions with Mr. Srinivasan, that S Tech and Mr. Hirst had knowledge of the use by Mr. Srinivasan and me of Management's  source code and other structural components relating to the Application; that they requested that Mr. Srinivasan copy and use Management's Application; that Mr. Srinivasan was named a partner or principal at S Tech; and that S Tech and Mr. Hirst (and perhaps others) are presently in possession of copies of Management's source  code and other components relating to the Application.

8.    I have reviewed the Verified Complaint dated January 25, 2008, filed by Management in this litigation.  Subject to this affidavit, and to the best of my knowledge, information and belief, I believe that the facts set forth in the Verified Complaint are true and accurate in all respects, although I do not have personal knowledge of any

3

conversations and interactions solely between S Tech, Mr. Hirst, Mr. Srinivasan and/or Management.

      9.     Prior to executing this affidavit, I read and reviewed this affidavit along with my attorney, David M. Levy.

                                           _____
                                             Alomgir Miah

Sworn to me before this
5th day of February 2008

Notary Public
DAVID M. LEVY
NOTARY PUBLIC, State of New York
No. 02LE6104552
Qualified in New York County
Commission Expires January 26, 2009

4

# Exhibit C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------- x

ELLIOTT MANAGEMENT CORPORATION,  :

                                Plaintiff,  :       Index No. 600239/08

                      :

          - against -        :       **AFFIDAVIT OF**

                      :       <u>**RAVI PAZHANI**</u>

ALAN HIRST, RAGUMARN SRINIVASAN, S TECH  :
and ALOMGIR MIAH,             :

                      :

                 Defendants.  :

-------------------------------------------- x

STATE OF NEW YORK    )
                         ) ss.:
COUNTY OF NEW YORK  )

      **RAVI PAZHANI**, being duly sworn, deposes and says:

      1.     I am a software developer and consultant for Elliott Management Corporation ("Management") and have served in this capacity, working in Management's Applications Development Department, since April 2005.  This affidavit is true and accurate in all respects.

      2.     I am one of the principal developers of an application (the "Application") that enables Management to manage a portfolio of asset-backed securities collateralized by mortgages and other loans.  The analytical features of the Application permit Management to organize and analyze large amounts of data relating to the underlying loans purchased primarily from commercial databases, to perform scenario analyses for these bonds and to project their performances in varied market conditions, and to display and manage the results of the analyses along with other relevant information.  This Application is designed to assist Management in making educated trading decisions.

3.    The Application, extremely complex and highly sophisticated, is owned by Management and is confidential and proprietary to Management.  The Application's development at Management took the work of at least four people, including me, over a period of two years.

4.    Defendants Ragumarn Srinivasan and Alomgir Miah, both of whom joined Management after I did and also worked in the Applications Development Department, were not involved in the initial development of the Application.

5.    In the Fall of 2007, a representative from a certain other fund or one of its affiliates (the "Other Fund") contacted Management in order to check the references of Mr. Srinivasan, then a full-time employee at Management and contractually prohibited from moonlighting and engaging in outside business activities.  Shortly thereafter, I spoke with Mr. Srinivasan, who acknowledged to me that he was seeking to be hired in connection with a software development project for the Other Fund, and asked if I wanted to work with him on the outside project.  I explicitly declined Mr. Srinivasan's offer and told him not to work elsewhere while in the employ of Management. I assumed that Mr. Srinivasan had taken my advice, but I recently learned that he did not.

6.    A few weeks ago, Mr. Srinivasan approached me and stated that he had in fact worked on and completed the project for the Other Fund and developed an application for the Other Fund that performed extremely similar functions as does Management's Application.   After I expressed significant disappointment with Mr. Srinivasan and his conduct, he volunteered that Mr. Miah assisted him in connection with the development of the application for the Other Fund.

2

7.    Mr. Srinivasan and Mr. Miah do not have the technical expertise to develop the application for the Other Fund independently, in a couple of months or over an extended period of time. Therefore, after my conversation with Mr. Srinivasan, I reviewed Management's computer system. I observed three troubling items. First, the source code relating to the Application had been copied, without authorization, in the Fall of 2007. Second, all Management source code contains a label, or tag, expressly identifying it as the property of Management, but I saw that the Management tag had been removed from the copied source code. Third, the computer system's log indicated that Mr. Srinivasan was responsible for copying the source code and removing the Management tag.

8.    Thereafter, I confronted Mr. Srinivasan, who stated that nobody else at Management would find out about his work for the Other Fund, and that Mr. Srinivasan and co-defendants Alan Hirst and S Tech were endeavoring to market the application, purportedly developed by them for the Other Fund, to other funds and entities on a monthly fee basis.

9.    I promptly reported Mr. Srinivasan's work for the Other Fund and his copying of the source code to a supervisor in Management's Applications Development Department, Amit Basu.

_____
Ravi Pazhani

Sworn to me before this
7th day of February 2008

Notary BONNIE J. LOEB
Notary Public, State of New York
No. 01LO4728600
Qualified in New York County
Commission Expires December 31, 20 /0

3

# Exhibit D

001286          002174

At IAS Part 39 of the Supreme Court of the State of New York, County of New York, held at the Courthouse, 60 Centre Street, New York, New York, on the 25 day of January 2008.

001050

PRESENT: *H Freedman* , J.S.C.

-------------------------------------- x

ELLIOTT MANAGEMENT CORPORATION,

Plaintiff,

- against -

ALAN HIRST, RAGUMARN SRINIVASAN, S TECH and ALOMGIR MIAH,

Defendants.

-------------------------------------- x

MOTION SEQUENCE # 001

Index No. 600239/08

ORDER TO SHOW CAUSE

Upon reading the Verified Complaint sworn to on January 25, 2008, the Emergency Affidavit in Support of Motion for Temporary Restraining Order sworn to on January 25, 2008, and sufficient cause appearing therefore, it is hereby

ORDERED that defendants Alan Hirst, Ragumarn Srinivasan, S Tech and Alomgir Miah (the "Defendants") show cause at IAS Part 39 of this Court, at 60 Centre Street, New York, New York, Room 208, on the 7th day of February, 2008 at 2:00 pm, or as soon thereafter as counsel can be heard, why an order should not be entered, pursuant to Rules 6301, 7102 and 105(u) of the Civil Practice Law and Rules, (a) preliminarily restraining each of the Defendants and all persons and entities acting in concert with them, pending final judgment, from utilizing, copying, disseminating, transferring, deleting, erasing, destroying, discarding, obscuring or otherwise disposing of any intellectual property or information technology belonging to plaintiff including, without limitation, the computer code, structures,

processes and other components relating to plaintiff's portfolio management computer application the computer application developed by Defendants for a certain other fund, and any other materials related to either of them; (b) directing defendants Hirst, Srinivasan and S Tech and all persons and entities acting in concert with them to return to plaintiff forthwith any and all intellectual property or information technology belonging to plaintiff including, without limitation, the computer code, structures, processes and other components relating to plaintiff's portfolio management computer application; and (c) granting such further and additional relief as may be just and appropriate;

IT IS FURTHER ORDERED that, pending the hearing ~~and disposition~~ of this motion, Defendants and all persons and entities acting in concert with them are each temporarily restrained from utilizing, copying, disseminating, transferring, deleting, erasing, destroying, discarding, obscuring or otherwise disposing of any intellectual property or information technology belonging to plaintiff including, without limitation, the computer code, structures, processes and other components relating to plaintiff's portfolio management computer application, the computer application developed by Defendants for a certain other fund, and any other materials related to either of them;

IT IS FURTHER ORDERED that Defendants shall serve their respective opposition to this motion, if any, so as to be received by counsel for plaintiff by no later than January 28, 2008; and

2

**IT IS FURTHER ORDERED** that service upon each of the Defendants with a copy of
this Order, along with any supporting papers, on or before January _personal_ 30 2008, shall be deemed
to be good and sufficient service.

ENTER:

_____
J.S.C.

ORAL ARGUMENT
DIRECTED
J.S.C.

3